IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs, November 30, 2012

## IN RE: LELAND C.L.

**Appeal from the Juvenile Court for Anderson County**
**No. J-28780     Hon. Brandon Fisher, Judge**

---

**No. E2012-00031-COA-R3-PT-FILED-DECEMBER 17, 2012**

---

This is a termination of parental rights case involving the biological father, David R. ("Father"), of the minor child, Leland C.L. The child was taken into custody on June 14, 2010, at two months of age, due to the biological mother's[1] drug use and the fact that he tested positive for opiates and hydrocodone at birth. The Department of Children's Services ("DCS") filed a Petition to Terminate Parental Rights naming the father as a respondent on January 7, 2011. Following a bench trial, the Court granted the Petition upon finding, by clear and convincing evidence, that the father had abandoned the child by failing to provide a suitable home for him, and also that the father was in substantial noncompliance with his permanency plans. The Court further found that termination was in the child's best interest. The father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

HERSCHEL P. FRANKS, P.J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

David Vander Sluis, Oak Ridge, Tennessee, for the appellant, David R.

Robert E. Cooper, Jr., Attorney General and Reporter, and Rebecca Lyford, Senior Counsel, Office of Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1] At the beginning of the trial, the mother stipulated that there was clear and convincing evidence to support termination of her rights, and her rights were terminated. The mother has not appealed.

# OPINION

Leland C.L. was born premature on April 19, 2010, and was taken into protective custody in June 2010. DCS developed permanency plans with the parents in July 2010, and the father's responsibilities included: visiting the child, submitting to and passing random drug screens at the visits, having an alcohol/drug assessment and following any recommendations, having a hair follicle drug test, becoming and remaining drug free, completing an anger management program, obtaining and maintaining a job and safe housing, keeping in contact with DCS, clearing up his criminal charges and refraining from incurring further charges, and completing parenting classes.

The father was arrested the day after the child came into custody on a domestic violence charge. The father attended one visit with the child in August 2010, and submitted to a random drug screen on that day. The father tested positive for benzodiazepines and methadone. The father did not visit with the child thereafter. The father was arrested again in September 2010 and served about 15 days in jail before he was released. The father was arrested again on October 1, 2010, made bond and was released that night, and then was arrested again on December 8, 2010. The father has been in jail continuously since that date. Prior to his incarceration, the father had not completed any of the requirements of his permanency plan, and since his incarceration, he had been moved to several different facilities and testified that he had not been able to do anything toward the plan requirements while in jail.

DCS filed a Petition to Terminate Parental Rights in January 2011, alleging grounds of substantial noncompliance with the permanency plans, persistent conditions, abandonment based on the father's failure to visit[2], and abandonment for failure to provide a suitable home. At the trial, the DCS case manager, Winter Ford, testified that when she initially met with the parents and developed the permanency plan, which the father signed, she obtained the father's phone number and gave him hers, and told him to be sure and keep in touch with her. Ford testified that she arranged for the father to visit with the child in August 2010, and he was drug tested that day. After the father failed the drug screen in August 2010, she arranged for him to have a hair follicle drug screen at Global Diagnostics and obtained funding to pay for same, but the father never did it. Ford testified that she also arranged for the father to be able to do his DNA test and establish paternity through the child support office in Oak Ridge, but the father never did that either. Ford testified that the father would tell her he was going to take a day off from work and go, but never did, and she stated that he never had any issues with transportation.

---

[2] DCS nonsuited this ground at the trial.

Ford testified that she repeatedly tried to contact the father by phone, and spoke to him once in October 2010 and scheduled a visit with the child, but he did not show up. Ford testified that at some point, the father's phone number stopped working, and she had to resort to trying to contact him by mail. Ford sent letters to the father on October 18, October 25, November 8, November 22, December 16, January 4, January 19, March 24, and one in July 2011. In the October 18, 2010, letter, Ford told the father that he had missed his visit and offered to schedule another one, and again gave him her phone number and asked him to contact her. Ford also sent a list of resources to the father and highlighted the numbers he could use to complete requirements on his plan. Ford sent a similar letter on October 25.

In the November 8, 2010, letter, Ford reiterated that the father needed to be working on the requirements of his plan, and asked him to contact her to let her know what progress he had made. Ford testified that she told the father that he had not visited since August 2010, which was a ground to terminate his parental rights, and also that he had not established paternity via DNA testing, which was also a ground to terminate his rights. Ford tentatively set up a meeting with the father for November 22, 2010, at 11:00 a.m., and gave him the address for DCS. She told the father that if he couldn't make that meeting, to let her know and she would reschedule it. Ms. Ford addressed the termination issue, provided him with the criteria for termination, and again gave him the address of the Child Support office so he could go do his DNA test.

Ford testified that the father did not show up for the meeting on November 22, so she sent him a letter that day to remind him of his plan requirements, and asking him to contact her to set up a visit. Ford testified that she did not know where the father was working, but knew he was supposed to be living on Jade Street in Clinton. She testified that she did not go to his house. Ford testified that the mother told her in December that the father was incarcerated, so she sent the father a letter at Knox County in January, and then went and visited him there in February. Ford testified that she found out at the jail that he was there for drug and gun charges.

Ford testified that the father was moved from Knox County to Anderson County to Blount County before going into the federal system, and he did not remain anywhere long enough for her to get any services or classes set up. Ford testified that the father did not keep her apprised of where he was, and she had only learned that he was in the federal system one month before trial. Ford testified that she had not yet tried to set up any classes through the federal system.

Ford testified that of all the letters she sent to the father at the Jade Street address, the only one that ever came back was the one sent on December 16, 2010. Ford provided the father with phone numbers to complete his requirements on his plan at their initial meeting

in July 2010, and thereafter in her letters. She testified that she asked the father if he needed help setting up his parenting classes, and he told her no, that he would go with the mother. Ford testified that as to the things she did set up for the father, i.e. the hair follicle drug test and DNA test, he never showed up for. Ford testified that after the August visit, she basically had no contact from the father, and her efforts to reach him were unsuccessful, thus preventing her from providing further help to him.

The father was allowed to testify via telephone from the federal facility in Georgia where he was being held. The father admitted that he was Leland's father, and stated that there was "no doubt". The father testified that he signed papers to have his name put on the birth certificate, but when they got the birth certificate back, his name was not on it. The father stated that it was not necessary for him to do a DNA test, and that he was willing to sign a document stating that he was the child's father.

The father testified that his most recent incarceration stemmed from going into a convenience store in possession of Xanax and a gun. The father stated that he was being held awaiting sentencing on his weapons charge, and that he had signed a plea agreement which stated that his sentence could be from zero to ten years, and his sentencing hearing was set for August 31, 2011. The father admitted that after the child was taken into custody, he was not in jail from the first of July to the first of September, spent about 15 days in jail in September, and then was free again until December 8, 2010 (except for one day in October). The father explained that he never went to any other visits with the child because there were warrants out for his arrest, and he was afraid to go into government buildings because he might be arrested. The father admitted that he never did any of the things required of him by the permanency plan, but stated that he did go to some NA meetings. The father testified that the current charges pending against him were for possession/sales of Schedule IV drugs, and unlawful possession of a firearm. The father testified that he expected to have to serve about two more years on his gun charge, and hoped to get out at the end of 2012 if he got good time credit. The father testified that he still had to deal with drug charges in Anderson County, but that he was going to fight them because he was not guilty.

The father testified that he had visited the child once, and had attended a meeting in July where the plan requirements were explained to him - he testified that he understood the requirements. The father testified that he knew what an A&D assessment was because he had one done some time in the past, but he did not make any effort to set one up this time because he checked into the cost and he didn't feel he could afford it, although he admitted that if he was working he might have had the money. The father testified that he knew he could have asked Ms. Ford for help, but he didn't because he had warrants out for his arrest - he testified that he didn't follow through like he should have because of his criminal charges. The father testified that he didn't feel that Ms. Ford offered him as much help as she did to

-4-

the mother, but admitted that he didn't stay in contact with Ms. Ford, either.

The father testified that it would have been helpful if Ms. Ford had tried to set up things for him rather than just giving him a list of resources, although he admitted that she did set up the hair follicle test for him, but stated that he didn't go because he was locked up. The father testified that he gave Ms. Ford his cell phone number, and that it was working until his incarceration in December. The father testified that he also gave Ms. Ford his father's phone number, which was still valid. The father testified that the Jade Court address in Clinton was his father's address, and that it would have been valid up to the time of his incarceration in December, and that Ms. Ford could have found him there. Inexplicably, however, the father testified that he never got any of the letters Ms. Ford sent to that address. The father also could not remember having gotten a letter from child support court ordering him to go for a DNA test in August 2010.

The father admitted that there had been no way to get classes set up for him since his arrest in December because he was moved around several times and was in each place on a temporary hold. The father also admitted that when he met with Ford in February, he told her that he had no idea when he would be getting out. The father testified that he had made arrangements to start drug classes when he got to federal prison after his sentencing.

Chris Chandler, the foster father, testified that he and his wife wanted to adopt the child, and that the child had been with them since he was just a couple of months old. Chandler testified that their home had four bedrooms and two bathrooms, and that he and his wife and their son were the only other persons living there. Chandler testified that his son was five, and that he and Leland got along well and were very bonded. Chandler testified that they could provide for Leland and had been doing so for some time. Ford testified that she saw the child 2-3 times per week either at the foster home or his daycare, and that he had just turned one about three months prior to trial. Ford testified that the child and the foster parents had a loving relationship and were very bonded, and that this was obvious because if she tried to hold him, he would move away from her and back to one of the foster parents. Ford testified that the foster parents took very good care of the child, and that they would be able to provide for all of his needs if they adopted him.

The Court took the matter under advisement and then issued its ruling approximately four months after trial. The Court found that the father was incarcerated on a weapons charge and was unsure of his release date, admitting that it could be anywhere from zero to ten years, and that he was also still battling drug charges pending in Anderson County. The Court found that there was no proof to establish the father's release date from prison, and that there was also no proof of what kind of home the father would go back to after his release. The Court thus found that there was clear and convincing evidence that the father had

abandoned the child by failing to provide a suitable home.

The Court also found clear and convincing evidence of substantial noncompliance with the permanency plans. The Court found that the plans were reasonable, and that DCS had done its best to help the father, but that the father had done nothing toward meeting the requirements of his plan. The Court found that the father had done nothing in the months prior to his incarceration because he was afraid of being arrested, and also that his incarceration was his fault, and that the latest criminal charges were incurred months after the child was taken into custody. The Court found that the father had completely failed to do anything required of him by his permanency plans, and had willfully cut off contact with DCS, thwarting DCS's ability to help him.

The Court found that it was in the child's best interest to terminate the father's parental rights, as the father had little contact with the child since his birth, and had been incarcerated numerous times and kept incurring criminal charges. The Court found that the father had never addressed any of his personal issues, had no meaningful relationship with the child, and had shown little interest. The Court found that the child was living in a safe, stable and loving foster home, and that the foster parents wanted to adopt the child and take care of him permanently despite his medically-fragile state. The Court found that the child was bonded to the foster parents and they to him, and that they were the only parents the child had ever known. The Court thus ruled that the father's parental rights should be terminated. The father filed a timely Notice of Appeal.

The father presents the following issues for our review:

1. Whether the Trial Court erred in finding that the proof presented by DCS established by clear and convincing evidence that DCS exercised reasonable efforts to provide services to the father that would have enabled DCS to reunify the family before finding that the parental rights of the father should be terminated?

2. Whether the Trial Court erred in finding that the proof presented by DCS established by clear and convincing evidence that the father's parental rights should be terminated on the ground of abandonment for failure to provide a suitable home?

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id.*; Tenn. R. App. P. 13(d). Great weight is accorded to the trial court's

determinations of witness credibility, which shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

As this Court has often stated:

It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S.*, 2011 WL 4553233 (Tenn. Ct. App. Oct. 4, 2011)(citations omitted).

The father challenges the Trial Court's finding that DCS made reasonable efforts to provide services to the father that would have enabled DCS to reunify the family before finding that the parental rights of the father should be terminated. The father argues that DCS's efforts to help him were instead unreasonable and completely inadequate. The father asserts that this case is analogous to *In re Tiffany B.*, 228 S.W.3d 148 (Tenn. Ct. App. 2007), wherein this Court reversed the trial court's termination of parental rights, finding that DCS had not presented clear and convincing evidence that it made reasonable efforts to help the parents.

In the *Tiffany B.* case, this Court made clear that DCS's efforts to assist the parents did not have to be "herculean", but that DCS had to do more than "simply provide the parents with a list of service providers and then leave the parents to obtain services on their own." 228 S.W.3d at 158. This Court stated:

The Department's employees must bring their education and training to bear to assist the parents in a reasonable way to address the conditions that required removing their children from their custody and to complete the tasks imposed on them in the permanency plan. The Department cannot use budgetary concerns to justify its failure to make reasonable efforts to reunify parents and their children.

The Department's efforts to reunify parents and their children will be deemed reasonable if the Department has exercised "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." The reasonableness of the Department's efforts depends upon the circumstances of the particular case. In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

Reunification of a family, however, is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents. Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody. They must also make reasonable efforts to rehabilitate themselves once services have been made available to them.

*Id*. at 158-159 (citations omitted).

In the *Tiffany B.* case, this Court found that there was little evidence presented at trial regarding DCS's efforts to locate or assist the parents from the time the child came into custody until the hearing on the petition to terminate. The Court noted that DCS made no effort to communicate with either parent in writing, and that DCS provided no evidence of contact with the parents at all except for one telephone call and the case manager's one visit to the parents while both were incarcerated. The case manager testified that the parents were hard to locate because they were "on the run", but this Court found that there was nothing in the record to support this contention other than the father's admission that he told the case manager they were "on the go", meaning that they were moving around trying to find work and a place to live.

This case is far different from the *Tiffany B.* case, however, because in this case the father admitted that he was actually "on the run" and had several warrants out for his arrest, and that for this reason, he avoided any contact with DCS by choice. The father testified that he did not attend visits with the child because he was afraid of being arrested, and that he did not keep in touch with the case manager for this same reason. The father testified that he gave Ms. Ford a valid phone number, but she testified that at some point it stopped working, and she had to resort to trying to contact the father by mail. Ms. Ford sent several letters to the father at the address he admitted was valid up to his final incarceration in December

2010, but he claimed to have gotten none of them, even though they were not returned.

Ms. Ford repeatedly tried to contact the father either by phone or mail, and provided him with lists of resources and telephone numbers on more than one occasion. The father admitted that he knew what was required of him from the permanency plan, and yet he did nothing to work toward fulfilling any of those requirements. Ms. Ford offered to set up parenting classes for the father, but he refused, stating he would just go with the mother. Ms. Ford set up visits with the child and meetings with DCS that the father did not attend. Ms. Ford set up and obtained funding for the father's hair follicle drug test, but he did not go. Ms. Ford arranged for DNA testing through the child support office, but the father did not go. Instead, the father admittedly avoided visiting the child and avoided all contact with DCS due to his fear of arrest. As such, this case is more analogous to the case of *In re Zeylon T.S.*, 2011 WL 5052957 (Tenn. Ct. App. Oct. 24, 2011), wherein the mother refused to keep in contact and refused to cooperate with DCS in any way, choosing instead "not to be found", and then later argued that DCS failed to make reasonable efforts to help her. This Court stated that "DCS cannot be expected to work miracles in the face of such dogged resistance to being assisted." *Id*. at *10. The same is true here. DCS clearly made reasonable efforts, as the Trial Court found, given the fact that the father refused to have any contact with DCS and thwarted the case manager's attempts to help in every way. The father's issue in this regard is without merit.

The father does not take issue with the Trial Court's finding that he was in substantial noncompliance with his permanency plan. Obviously, this finding is supported by the evidence, as the father did absolutely nothing toward any of the requirements of his plan, despite having many months when he was not incarcerated. The father admitted that he knew the requirements of the plan, and he never disputed their reasonableness. The father admitted that he received information from the case manager about resources, and that he knew how to get help - he simply stated that he did not follow through because of his criminal charges and his fear of arrest.

The father's fear of arrest due to outstanding warrants is no excuse for his failure to comply with the permanency plan, however - as this Court has previously stated, self-created legal problems do not constitute an excuse for failing to visit one's child, and similarly, should not create a legal basis for failure to comply with the requirements of a permanency plan. *See, e.g.*, *In the Matter of Shipley*, 1997 WL 596281 (Tenn. Ct. App. Sept. 29, 1997); *In the Matter of MCG*, 1999 WL 332729 (Tenn. Ct. App. May 26, 1999). Thus, the Trial Court properly found that clear and convincing evidence was shown of the father's substantial noncompliance with the requirements of his permanency plan, and termination was proper based upon this ground. As only one statutory ground is required, the father's arguments regarding abandonment for failure to provide a suitable home need not be

addressed.  *In re DLB*, 118 S.W.3d 360 (Tenn. 2003).

The Judgment of the Trial Court is affirmed.  Costs on appeal are taxed to appellant, David R. This case is remanded to the Trial Court, pursuant to applicable law, for enforcement of the Court's judgment and the collection of costs assessed below.

_____
HERSCHEL P. FRANKS, P.J.